ALFONSO E. ARANA, Petitioner and Appellant, *v.* BOARD OF EXAMINERS OF ENGINEERS, ETC., Respondent and Appellee.

No. 7114. Argued February 21, 1936.—Decided April 20, 1937.

*Abelardo Casanova Prats* for appellant. *B. Fernández García, Attorney General,* and *T. Torres Pérez, Assistant Attorney General,* for appellees.

Mr. Justice Hutchison delivered the opinion of the court.

In a proceeding for mandamus to compel the Board of Examiners of Engineers, Architects, and Surveyors to issue a license to practice as a civil engineer, the district court annulled an alternative writ previously issued and dismissed the proceeding.

The final action of the board had been to issue a license to practice as a surveyor and transportation engineer. The district court held that Arana's experience, as shown by his application for a license, and his sworn statement in connection therewith, did not entitle him to a license as a civil engineer. The gist of Arana's sworn statement is set forth by the district judge as follows:

"In the affidavit of Alfonso E. Arana, sworn to before Notary Public A. Casanova Prats, on January 17, 1928, the only document presented at this trial relative to the practice by the petitioner of his profession as a civil engineer, which he submitted to the consideration of the board, he states that he is 24 years old and that since September 5, 1923 (that is, since he was 20 years old), he has been practicing the profession of civil engineer, and that his instruction, preparation, and experience have consisted of study from 1920 to 1923 in the college of Agriculture and Engineering of Mayagüez, through the second year of the course and from 1923 to January 17, 1928, of study with the International Schools of Scranton, Pa., without having finished these studies.

"As to the experience and the work performed, it appears from the affidavit that the petitioner, from September 5, 1923, to January 17, 1928, was an employee of the Department of Commerce of the United States, in the Lighthouse Service, and that his work consisted

of studies, budgets, construction, and preparation in the Ninth District of Lighthouses of the United States, work having been performed there under his direction and supervision, consisting of a marginal dock, lighthouse reserve, a concrete roadway at the Borinquen Lighthouse, the installation of an automatic lighthouse in the island of Navassa, repair of the lighthouses at Maunabo and Cabo Rojo, repair of the roads leading to the latter lighthouses, repair of the dock at Guantánamo, Cuba, and the alteration of the house of the supervisor. He states that while he was on leave of absence in 1924, he was technical director of the construction of a bridge across the Boca Prieta River, in Humacao."

The bridge was forty meters in length. The importance of the other work is indicated by the following itemized statement as to cost:

"STATEMENT OF EXPERIENCE.

"Time: Since, Up to: Work performed in the Lighthouse Service since September 1923, up to the present time, under my direction and supervision.

"Employed by whom: Bureau of Lighthouse.

"Kind of work: Detailed: 1. Marginal dock, lighthouse reserve, $100,000. 2. Concrete roadway, Borinquen Lighthouse, $11,000. 3. Installation of automatic lighthouse, Navassa Is., $11,000. 4. Repair of Maunabo Lighthouse, $6,000. 5. Repair of Cabo Rojo Lighthouse, $6,000. 6. Road leading to Manatí Lighthouse, $30,000. 7. Road leading to Cabo Rojo Lighthouse, $3,000. 8. Repair of dock at Guantánamo, Cuba, $3,000. 9. Alteration of supervisor's house, $6,000. Repair and construction in the district with an annual budget of $20,000."

All of these jobs were unquestionably engineering projects. They were presented as evidence of what Arana had done as an engineer. In view of his sworn statement that he had performed this work as a civil engineer, the burden was upon the board to show that the work had not been planned and designed, as well as executed, by him as an engineer, if that were the fact. *Serra* v. *Board of Examiners of Engineers,* 43 P.R.R. 727; *Llovet* v. *Board of Examiners of Engineers, etc.,* 40 P.R.R. 560; *Arán* v. *Board of Examiners of Engineers, etc.,* 40 P.R.R. 565; *González* v.

*Board of Examiners of Engineers, etc.,* 40 P.R.R. 566; *Flores* v. *Board of Examiners of Engineers, etc.,* 40 P.R.R. 567; *Isern* v. *Board of Examiners,* 45 P.R.R. 567.

The issuance of a license as transportation engineer was in effect an admission that Arana had done the work as an engineer. Putting out of view for the moment other aspects of the case, the only question before the district court was whether the board should not have issued a license as civil engineer instead of a license as surveyor and transportation engineer.

Sections 9 and 10 of Act number 31, approved on April 26, 1927 (Session Laws of that year, 182, 186), read as follows:

"Section 9.—At any time within the six months following the date on which this Act takes effect, the board shall issue a license to practice engineering, architecture or surveying to any person who, having paid the fees hereinafter specified:

"(*a*) Has finished the course in engineering, architecture or surveying in some school or university; or

"(*b*) Has practiced the profession of engineering, architecture or surveying for a period of not less than three years, prior to the date of approval of this Act.

"Unless evidence to the contrary exists, the board shall accept the sworn statement in the application as satisfactory evidence that the applicant has practiced the profession of engineering, architecture or surveying for a period of three years.

"Section 10.—The board shall issue said licenses, indicating thereon the branch of engineering the licensee is authorized to practice, such as civil, mechanical or electrical engineering, etc.; *Provided,* That any person having received a certificate authorizing him to practice as a civil engineer, may also practice as a surveyor."

From Nelson's Encyclopedia, vol. 4, p. 405, we take the following extract:

"*Engineering, Civil,* a term originally used to embrace all engineering practice that was not included under the head of military engineering, but now restricted to the planning and constructing of fixed structures of utilitarian character, in distinction from moving structures or machines, the province of the mechanical engineer,

and of structures primarily ornamental, the field of the architect. Its chief applications or fields of activity are: (*a*) securing the land against natural forces, by retaining walls, drainage ditches, flood-protection works, sea walls, breakwaters, shore revetments, pavements, etc.; (*b*) making ways of communication, by roads, railways, canals, and dredged channels, lighthouses, tunnels and bridges; (*c*) water supply to towns, by wells, dams, reservoirs, aqueducts, pipe networks, filters, etc.; (*d*) drainage and refuse disposal for towns, by sewage-pipe systems, sewage filters and purifying tanks, garbage furnaces and digesters, etc.; and (*e*) constructing buildings, platforms, docks and wharves. It includes, also, the measurements of land by surveying (q. v.), which is required in nearly every civil engineering undertaking.

"Prior to the nineteenth century practically all construction was carried on by architects, ordinary craftsmen and army engineers. Machine building—then a very limited field—and the practice of mining were merely special crafts. Toward the close of the eighteenth century the increasing amount and complexity of construction created a demand for men of exceptional ability and special experience or training to plan and supervise the building of roads, waterworks, lighthouses, bridges and similar large fixed structures. Thus, a class of men grew up, trained both in the analytical study of structures and in the practical utilization of materials. To distinguish these from the military engineers, who devoted themselves to similar problems of a military nature, they were called civil engineers. With the development of the steam engine in the early nineteenth century, a demand arose for engineers specially trained in the design and construction of machines, and this gradually led to the growth of a distinct professional field called mechanical engineering (see Engineering, Mechanical). Mining practice also came to require the application of scientific knowledge and experience, and later, the practical utilization of electrical science developed still another special school of engineering. The field left to the civil engineer, however, is still a large one. The range of its activities is far beyond the scope of a single individual and specialization, as in bridge design, water supply engineering, railway location, etc., is the rule."

See also 20 C. J. 1260, and Century Dictionary, vol. 3, p. 1931.

Section 9 of the law speaks of "engineering, architecture or surveying" in general terms only. Section 10 provides

that the licenses issued by the board shall indicate (italics ours) "the branch the license is authorized to practice, *such as civil, mechanical or electrical engineering, etc.*" The board, by the adoption of regulations, divided all engineering into eight fields of activity designated as:

"Civil engineering, mining engineer, agricultural engineer, mountains engineer, chemical engineer, electrical engineer, electro-chemical engineer."

.It then subdivided the field of civil engineering as follows:

"Topographical engineer, engineer of ordinary and concrete roadways, of docks and channels, or of ways of communication; municipal and sanitary engineer; structural and hydraulic engineering."

This subdivision of civil engineering is not such a classification as contemplated and authorized by section 10. The "etc." must be construed in connection with the context. So construed it means only those large fields of activity which are now regarded as separate and independent departments of engineering, whether carved out of the originally larger field of civil engineering or not. The examples given by section 10, "civil, mechanical" and "electrical engineering," are such separate and independent departments of engineering. Whatever the actual status of transportation engineering may be, it is classified by the board itself as a subdivision of civil engineering. Hence, it is not "such" a branch of engineering as "civil, mechanical or electrical engineering." It is a subdivision of the field of civil engineering.

As shown by some of the testimony adduced at the trial, civil engineering formerly included engineering and architecture, and, at one time, mechanical engineering included electrical engineering. Transportation engineering, as also indicated by this testimony, may include all of the actual experience disclosed by Arana's sworn statement, except the item as to alterations of the supervisor's house at Guantánamo at a cost of $6,000. By the same token, it also includes

engineering projects in which Arana had never had any actual experience as for example the planning, designing, and construction of canals and railroads.

For more than a quarter of a century prior to 1927, there were no restrictions on the practice of engineering. It was for this reason, no doubt, that the Legislature did not require previous experience in all the ramifications of the branch of engineering "such as civil, mechanical or electrical engineering, etc." which the applicant for a license had been practicing. In any event, it is for this reason that this court has heretofore construed the law somewhat liberally in favor of the applicant. See cases cited, *supra.*

Nelson's Encyclopedia defines electrical engineering as follows:

"*Engineering, Electrical,* that branch of engineering which has as its basic idea the control of electrical energy for human service with the highest efficiency compatible with economical investment. It may be divided according to the class of service involved, as telephony, telegraphy, electro-chemistry, electric railroading, power generation and transmission, industrial applications, lighting, etc. No rigid classification can be made, however, as many of these services are interdependent.

"In all divisions, three kinds of effort may be more or less clearly observed: (1) inventive effort, covering investigation of phenomena, and the design and building of apparatus to utilize discoveries; (2) service-development effort, covering study of natural conditions, grouping of machinery, and planning and building of complete works to utilize natural forces and human inventions; (3) operating effort, covering daily manipulation of machines and actual furnishing of service."

In *Isern* v. *Board of Examiners, supra,* the applicant had worked in the Insular Government as a telegraph operator and had been employed by an electrical company. As an employee of the electrical company, he worked as a lineman during the day, and was in charge of the switchboard and dynamos at night. For two years, he was manager of the

municipal electrical plant in Arecibo. For five years he was an inspector of installations made by the P. R. Railway, Light & Power Co. for the purpose of electric lighting. Thereafter, and at the time of his application, he was employed at the Humacao agency of that company, where he attended to the extension of the company's lines, both primary and secondary, the installation of transformers, motors, ranges, heaters, and all kinds of equipment in Humacao, Yabucoa, Naguabo, and Las Piedras.

The Board of Examiners appealed from an adverse judgment in a mandamus proceeding on the ground, among others, that the applicant had not been practicing as an electrical engineer. The appeal was dismissed as frivolous.

Unless we are to abandon the doctrine of the *Isern* case, Arana had been practicing as a civil engineer for more than three years prior to the Act of 1927, and was, therefore, entitled to his license as a civil engineer. As a background for his practical experience, he had already received two years of instruction in a school of engineering. He was, to say the least, quite as well qualified as most, if not all, of the applicants whose cases have heretofore come before this court. We find no satisfactory reason for overruling the *ratio decidendi* of the *Isern* case.

■ The district court also held that defendants herein had no ministerial duty to perform, because they were not members of the board in June 1928, when the board as then constituted refused to issue a license as civil engineer and issued in lieu thereof a license as transportation engineer. The instant case is governed, we think, by *Romero* v. *Gore*, 46 P.R.R. 366; not by *Negrón* v. *Superintendent of Elections*, 11 P.R.R. 352, and *Honoré* v. *Wilson*, 32 P.R.R. 761.

■ The district court also held that petitioner was guilty of laches. Petitioner filed his application for a license in January 1928. His application was denied in March of that year. The applicant moved for a rehearing in April. This

request was refused May 29th. In June, the applicant renewed his request and was granted a hearing June 19th. The board then expressed its opinion to the effect that inasmuch as he had been employed as a foreman in the Lighthouse Service, his experience had not been that of a civil engineer and said that it would issue him a license as surveyor and transportation engineer. .It explained that this title was conferred in Spain upon civil engineers after eight years of academic training and was, therefore, equivalent to. the title of civil engineer under the Law of 1927. The applicant, relying upon this information, accepted the license as surveyor and transportation engineer.

Arana did not know that he was unauthorized to practice as a civil engineer until September 1933, when the Department of Health rejected certain plans which he had signed and submitted to that department for its approval. In October of that year, he renewed his application for a license to practice as a civil engineer, and the Board of Examiners, in a letter dated July 3, 1934, again denied his application. Arana then filed his petition for a writ of mandamus, March 12, 1935. In his verified petition, he set forth all of the foregoing facts which, for want of a traverse, were admitted by defendants. Those facts furnished a satisfactory explanation for the long delay. Petitioner was not guilty of laches. See: 38 C. J. 833, sec. 534; *State* v. *Board of Com'rs,* 153 La. 705, 96 S. 539; *Blanco* v. *Domenech,* 45 P.R.R. 827.

The district judge also said that if Arana were a civil engineer, he should have known that the license issued by the board and accepted by him, was worthless and covered only a branch of civil engineering. Arana, however, did not profess to be a civil engineer in the sense in which the district judge used that term. The law did not require that he should be a civil engineer in that sense in order to obtain a license to practice as a civil engineer. The only prerequisite to the issuance of such a license was three years of previous practice in civil engineering with or without the

qualifications required of those who had not had such previous experience.

The judgment appealed from must be reversed, and a writ of mandamus will be issued in accordance with petitioner's prayer for relief.

Mr. Justice Córdova Dávila and Mr. Justice Travieso took no part in the decision of this case.